HANK G. GREENBLATT, ESQ. / SBN: 143415
**DREYER BABICH BUCCOLA WOOD CAMPORA, LLP**
20 Bicentennial Circle
Sacramento, CA 95826
Telephone: (916) 379-3500
Facsimile: (916) 379-3599

LUIS A. CESPEDES, ESQ. / SBN: 97264
**LAW OFFICES OF LUIS A CESPEDES**
701 E Street, #C
Sacramento, CA 95814
Telephone: (916) 443-8465
Facsimile: (916) 446-7412

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUIS MARTINEZ-RODRIGUEZ, individually and METZLY M., a minor, by and through her guardian ad litem, SYLVIA VILLALPANDO,<br><br>Plaintiffs,<br><br>v.<br><br>BANK OF AMERICA, ALEX AIVALIKLIS, and DOES 1 through 30, inclusive,<br><br>Defendants. | Case No.: 4:11-CV-06572 CRB<br><br>**PLAINTIFFS OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED (FRCP 12(b)(6))**<br><br>Date: March 16, 2012<br>Time: 10:00 a.m.<br>Courtroom: 6<br>Judge: Hon. Charles R. Breyer |

---

**PLAINTIFFS OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED (FRCP 12(b)(6))**
**4:11-CV-06572 CRB**

**TABLE OF CONTENTS**

Page

I. INTRODUCTION AND SUMMARY OF ARGUMENT.................................................. 1

II. LEGAL STANDARD........................................................................................... 4

III. DEFENDANTS SEEK TO DISMISS THE 1983 ACTION, BY ALLEGING BANK OF AMERICA WAS NOT ACTING UNDER COLOR OF LAW. HOWEVER, TO THE CONTRARY, DEFENDANT AIVALIKLIS, AS THE AGENT FOR BANK OF AMERICA HELD HIMSELF OUT AS ACTING UNDER COLOR OF AUTHORITY BY DEMANDING TO SEE PLAINTIFF'S SOCIAL SECURITY CARD.......................... 5

IV. PLAINTIFF CONTENDS THAT THE MISREPRESENTATION AND FRAUD CLAIMS ASSERTED IN THE COMPLAINT ARE ADEQUATELY PLEAD................ 11

V. PLAINTIFF CONTENDS THAT THE CLAIMS FOR CONSPIRACY, CONVERSION OR MISAPPROPRIATION ASSERTED IN THE COMPLAINT ARE ADEQUATELY PLEAD........................................................................... 12

VI. PLAINTIFF CONTENDS THAT THE HIS CLAIM REGARDING DEFENDANT'S VIOLATION OF THE FAIR HOUSING ACT WAS ADEQUATELY PLEAD SINCE THE TERM "FROZE" IS CLEAR AND NOT VAGUE AS THE DEFENDANT CONTENDS................................................................................14

VII. PLAINTIFF CONTENDS THAT HIS CLAIM FOR DECLARATORY RELIEF WAS ADEQUATELY PLEAD................................................................................14

VIII. PLAINTIFFS ALLEGED SUFFICIENT FACTS REGARDING FALSE IMPRISONMENT CAUSE OF ACTION..............................................................15

# TABLE OF AUTHORITIES

Page(s)

### FEDERAL CASES

*Brentwood Academy v. Tennessee Secondary School Athletic Ass.* 531 U.S. 288 (2001)... 9

*Burton v. Wilmington Parking Authority* 365 U.S. 715 (1961).................................................. 10

*Cahill v. Liberty Mutual Insurance Company* 80 F. 3d 336, 337-338 (9th Circuit, 1996)... 5

*Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)............................................................................ 4

*Dennis v. Sparks* 449 U.S. 24 (1980)........................................................................................ 9

*Jackson v. Metro Edison Co* 419 U.S. 345, 351 (1974).............................................................. 10

*Lugar v. Edmondson Oil Company, Inc.* 457 U.S. 922, 940 (1982)........................................... 8

*Mastandrea v. Gurrentz International Corporation,* 65 F.R.D. 52, 54-55 (W.D. PA. 1974)... 4

*Newman v. Universal Pictures,* 813 F. 2d 1519, 1521-22 (9th Circuit 1987)........................... 5

*North Georgia Finishing Inc. v. Di-Chem, Inc.* 419 U.S. 601 (1975)......................................... 9

*Phillips v. Bureau of Prisons* 591 F.2d 966, 969 (D.C. Circuit 1979)........................................ 4

*Strawbridge v. Bednaric,* 460 Supp. 1171, 1172, (E.D. PA. 1978)............................................ 4

### FEDERAL STATUTES

Federal Rule of Civil Procedure 8(a)(2)..................................................................................... 4

Federal Rule of Civil Procedure 12(b)(6).................................................................................. 4

U.S.A. Patriot Act, Pub. L. No. 107-56, 115 Stat 272 (2001).................................................... 9

U.S. Anti-Money Laundering Programs 31 CFR §103.121 (2007)........................................... 10

### OTHER

CACI 1900.................................................................................................................................. 12

CACI 3600.......................................................................................................................... 12, 13

CACI 2100.................................................................................................................................. 13

CACI 1400.................................................................................................................................. 15

TABLE OF AUTHORITIES

HANK G. GREENBLATT, ESQ. / SBN: 143415
**DREYER BABICH BUCCOLA WOOD, LLP**
20 Bicentennial Circle
Sacramento, CA 95826
Telephone: (916) 379-3500
Facsimile: (916) 379-3599

LUIS A. CESPEDES, ESQ. / SBN: 97264
**LAW OFFICES OF LUIS A CESPEDES**
701 E Street, #C
Sacramento, CA 95814
Telephone: (916) 443-8465
Facsimile: (916) 446-7412

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUIS MARTINEZ-RODRIGUEZ, individually and METZLY M., a minor, by and through her guardian ad litem, SYLVIA VILLALPANDO,<br><br>    Plaintiffs,<br><br>v.<br><br>BANK OF AMERICA, ALEX AIVALIKLIS, and DOES 1 through 30, inclusive,<br><br>    Defendants. | Case No.: 4:11-CV-06572 CRB<br><br>**PLAINTIFFS OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED (FRCP 12(b)(6))**<br><br>Date: March 16, 2012<br>Time: 10:00 a.m.<br>Courtroom: 6<br>Judge: Hon. Charles R. Breyer |

Plaintiffs hereby submits this Opposition to Defendants' Motion to Dismiss, pursuant to Rule 12 (b)(6).

## I.
## INTRODUCTION AND SUMMARY OF ARGUMENT

It has been stated that America's immigrant population constitutes the largest of any society in world history. Immigrants from Mexico represent the largest single group, comprising over 27 percent of all immigrants.[1] Immigration from Mexico has been described

---
[1] Rich, Spencer, *U.S. Immigrant Population at Post-War High*, Washington Post, August 29, 1995

-1-
**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED (FRCP 12(B)(6))**

as constituting the greatest migration of people in the history of humanity.[2]

Interestingly, the burgeoning U.S. Hispanic population is a $928 billing dollar annual spending demographic, targeted with marketing messages from businesses large and small. Wal-Mart alone spends over $60 million dollars a year in marketing to the Hispanic population.[3]

Allstate Insurance spent over $3 million dollars on Hispanic television and print advertising in 2004. Allstate insures over two million Hispanics, and Hispanic related revenues top $2 billion.[4] The Federal Trade Commission has determined that Spanish speakers are more likely to be the victims of fraud and less likely to report the fraud to authorities than English speakers.[5]

According to the Department of Homeland Security, between the year 2000 and 2006, an estimated 11,550,000 unauthorized immigrants came to the United States.[6] A large portion of both unauthorized and legal immigrants are of Hispanic origin[7]. One study reveals that forty-three percent of individuals identifying themselves as of Hispanic or Latino origin do not have bank accounts[8]. Against this factual background, Bank of America has spent millions of dollars advertising in Spanish to the Hispanic community, attempting to lure in customers that speak Spanish as their primary language, both born in the United States as well as undocumented immigrants. Bank of America began a program to open bank accounts through programs written in Spanish, and by maintaining policies eliminating the need for credit histories, Social Security numbers, or other traditionally required methods of identification for bank accounts and credit cards.

In an article written by Kenneth D. Lewis, Chairman and CEO of Bank of America, and

---

[2] Marilyn Davis, Mexican Voices/American Dreams, 4 (1990)
[3] Consumer Protection in the Hispanic Community, Copyright 2008, Florida State Bar, Gale Publishing
[4] Korzenny, Trends in Marketing to Hispanics, Florida State University
[5] Consumer Protection in the Hispanic Community, Copyright 2008, Florida State Bar, Gale Publishing
[6] OFFICE OF IMMIGRATION STATISTICS, DEP'T OF HOMELAND SEC., POPULATION ESTIMATES: ESTIMATES OF THE UNAUTHORIZED IMMIGRANT POPULATION RESIDING IN THE UNITED STATES, 4 (2006), available at http://www.dhs.gov/xlibrary/assets/statistics/publications/ill_pe_2006.pdf [hereinafter POPULATION ESTIMATES].
[7] OFFICE OF IMMIGRATION STATISTICS, DEP'T OF HOMELAD SEC., ANNUAL FLOW REPORT: U.S. LEGAL PERMANENT RESIDENTS 3 (2006) available at http://www.dhs.gov/xlibrary/assets/statistics/publications/IS-4496_LPRFlowReport_04vaccessible.pdf; Population Estimates, supra note 11, at 4.
[8] DULCE BENAVIDES, SERGIO BENDIXON, B. LINDSEY LOWELL & ROBERTO SURO, PEW HISPANIC CTR., BILLIONS IN MOTIONS: LATINO IMMIGRATNS REMITTANCES AND BANKING 19 (2002), http://pewhispanic.org/files/reports/12.pdf. This number is representative of all people identifying themselves as Hispanic origin, not just Hispanic immigrants. Id. Presumably, the number of Hispanic immigrants who do not have bank accounts would be even larger. See id.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED (FRCP 12(B)(6))

published in the Wall Street Journal on February 22, 2007, Mr. Lewis addressed this program marketing banking services to undocumented aliens. At paragraph 2, Mr. Lewis states:

> "The program is not about illegal immigrants and never was. It is designed to help Bank of America customers build a credit history. Second, we believe we have an obligation to serve all those in our country who are legally eligible to receive services. To do less would be discriminatory and unfair."[9]

Bank of America representatives have even taken the position that they deliberately accept the Matricula Consular card, issued by the Mexican Government, to make it easier for Mexican citizens living in the United States of Amercia to have access to banking services from Bank of America. (Statement of Gabriel Manjarrez, Senior Vice-President, National Hispanic Consumer Marketing Bank of America, testimony before the subcommittee on Financial Institutions and Consumer Credit of the United States House of Representatives Committee on Financial Services, June 29, 2003). Mr. Manjarrez goes on to state that:

> "some critics of the Mexican Consulate I.D. have raised concerns about increased risk of fraud. We thoroughly consider these risks and have significant controls in place for screening potential customers and monitoring their accounts for fraudulent activity. We are also working closely with government agencies to comply with ANY and ALL regulatory requirements including those resulting from the Patriot Act."[10]

Yet despite their promises to welcome such undocumented immigrants as customers to Bank of America, apparently, Defendant's employee embarked upon his own self-styled mission to detain and cause the arrest of Mr. Martinez, for doing nothing more than attempting to open another checking account, at the banking institution where he had long banked at and proven to be a loyal customer. Bank of America, through their agent, conceived of a sting scheme, whereby in violation of Bank of America policies, the local branch manager, Defendant, Aivaliklis, "lured" Plaintiff back into the bank on a separate occasion than when he initially presented to open up a checking account, this time bringing his young daughter with him. While there, Aivaliklis unlawfully detained him, constituting a false imprisonment, so that

---

[9] Wall Street Journal, 2/22/07 Article by Kenneth D. Lewis

[10] Statement of Gabriel Manjarrez, Senior Vice-President, National Hispanic Consumer Marketing Bank of America, testimony before the subcommittee on Financial Institutions and Consumer Credit of the United States House of Representatives Committee on Financial Services, June 29, 2003

Aivaliklis could phone the police, and report he suspected a "crime" was taking place in the branch.[11]

Defendants bring this Motion to Dismiss pursuant to Rule 12(b)(6), alleging that Plaintiff has failed to state a claim upon which relief can be granted. Plaintiffs contend that Defendant's motion is unsupported and must fail.

## II.
## LEGAL STANDARD

First and foremost, Plaintiffs contend that they have complied with Federal Rules of Civil Procedure 8 (a)(2), and provided a "short and plain statement of the claim showing that the pleader is entitled to relief." Rule 12 (b)(6) addresses the legal sufficiency of the claim. It has been stated that in ruling on a 12 (b)(6) motion:

> "A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the Plaintiff can prove no set of facts in support of his claim which would entitle him to relief. The court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegation." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957).

In applying the *Conley* standards, the court will, "accept the truth of the well-pleaded factual allegations of the complaint and may look beyond the complaint only to items in the record of the case or to matters of general public record." *Phillips v. Bureau of Prisons* 591 F.2d 966, 969 (D.C. Circuit 1979).

The court is likely to view the claim in the light most favorable to the claimant. (*Strawbridge v. Bednaric*, 460 F. Supp. 1171, 1172, E.D. PA. 1978). While the 12 (b)(6) defense is often interposed it is viewed by the courts with disfavor and granted in proportionately few cases. *Mastandrea v. Gurrentz International Corporation,* 65 F.R.D. 52, 54-55 (W.D. PA. 1974).

A court may dismiss a claim pursuant to Rule 12(b)(6) when "it is clear that no relief

---

[11] Thereafter, the local police arrived and placed Mr. Martinez under arrest, before transferring him to the Immigrations and Customs Enforcement Agency, where he was incarcerated for several weeks. At that point, Mr. Martinez was released with permission to return home in California, pending further administrative hearings and a pending cancellation of removal proceeding, scheduled by the Immigration Agency for June 2013.

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED (FRCP 12(B)(6))**

could be granted under any set of facts that could be proved consistent with the allegations" set forth in the complaint. *Newman v. Universal Pictures*, 813 F. 2d 1519, 1521-22 (9th Circuit 1987). The court must view all allegations in the complaint in a light most favorable to the non-movant and must accept as true all material allegations and reasonable inferences to be drawn from them. *Cahill v. Liberty Mutual Insurance Company* 80 F. 3d 336, 337-338 (9th Circuit, 1996).

Here, Plaintiffs contend that consistent with Rule 8(a)(2), Plaintiff's complaint contains a short and plain statement of the claim showing that the pleader is entitled to relief. Here, Plaintiff's complaint and the simple and straightforward manner, sets forth the allegations against Defendants demonstrating that the pleader is entitled to relief. Plaintiff contents that Defendants' Motion to Dismiss should be denied.

### III.
**DEFENDANTS SEEK TO DISMISS THE 1983 ACTION, BY ALLEGING BANK OF AMERICA WAS NOT ACTING UNDER COLOR OF LAW. HOWEVER, TO THE CONTRARY, DEFENDANT AIVALIKLIS, AS THE AGENT FOR BANK OF AMERICA HELD HIMSELF OUT AS ACTING UNDER COLOR OF AUTHORITY BY DEMANDING TO SEE PLAINTIFF'S SOCIAL SECURITY CARD**

U.S. Code Section 1983 was originally enacted on April 20, 1871, as part of the Civil Rights Act of 1871. It is also known as the "Ku Klux Klan Act" because one of its primary purposes was to provide a civil remedy against the abuses that were being committed in the southern states by private parties affiliated with the Ku Klux Klan. While the existing law protected all citizens in theory, its protection and practice was unavailable to some because those persons charged with the enforcement of the laws were unable to unwilling to do so. The Act was intended to provide a private remedy for such violations of Federal Civil Rights law, and has subsequently been interpreted to create a cause of action for tort liability.

Notwithstanding Plaintiffs' objections to the Declaration of Aivaliklis, and accepting Aivaliklis' Declaration at face value, Aivaliklis states, under penalty of perjury, at paragraph eleven:

> "I explained to Mr. Martinez that Bank of America flagged his account and asked me to verify the authenticity of the Social Security number used to open the account. I then asked Mr. Martinez to hand me his Social Security card."

Aivaliklis goes on to state at paragraph twelve:

> "Thus in my experience as a bank employee, I have seen and held thousands of Social Security cards. When Mr. Martinez handed me his Social Security card, I immediately suspected it was a fake."

By his Declaration, Aivaliklis admits that no one in the Fraud Prevention Group instructed or directed Mr. Aivaliklis to "inspect" the Social Security card for authenticity. Mr. Aivaliklis offers no explanation that he would be considered an "expert" as to the authenticity of a Social Security card, other than his own personal experience in "feeling" the stock of the paper and type of font used. Mr. Aivaliklis lured Mr. Martinez to the branch under color of authority, that he was in the process of following up on an irregularity, when in contrast, he had never been directed to inspect the Social Security card. By Mr. Aivaliklis demanding that Mr. Martinez produce a card, he placed Mr. Martinez in a position where Mr. Martinez believed that he had no choice but to produce the card, much like a law enforcement officer demanding identification. A reasonable person would not believe they have the opportunity to refuse to do so. By doing so, Mr. Aivaliklis created the impression of "color of authority", that it was being done pursuant to federal or state banking regulations, and that Mr. Martinez had no choice but to surrender the Social Security card. Interestingly, despite the fact that Mr. Aivaliklis admits at paragraph seven of his Declaration that the proprietary Bank of America COIN computer system was able to confirm that Mr. Martinez had multiple accounts and a mortgage with Bank of America, Mr. Aivaliklis offers no explanation as to why he did not determine if Mr. Martinez had a Bank of America issued identification card (which he did) which could have easily been used to identify Mr. Martinez as a Bank of America customer. Similarly, Mr. Aivaliklis never alludes to or suggests that he asked to see Mr. Martinez's California driver's license or Matricula Consular card. Rather, Aivaliklis held himself out as being an "official" who had the authority under federal or state banking laws to demand to see a Social Security card, when in fact, this was not true.

While the Declaration of Aivaliklis suggests that he was not acting under any direction or authority of any state agency, he certainly deliberately created the impression that he was.

By doing so, Plaintiffs contend that his conduct, in alleging that he was doing so consistent with federal banking laws, suggests that the particular action is "inextricably intertwined" with those of the government, so as to qualify under the "Joint Action" test to identify state action by the private actors, for purposes of Section 1983.

Under Bank of America's theory, a branch manager would equally be free to simply choose to detain Hispanics on the basis of nothing more than "suspicion" that they may be "illegal", so that the manager could embark upon his own immigration policy of turning undocumented aliens over to Immigrations & Customs Enforcement. As stated elsewhere, this certainly would be inconsistent with Bank of America policy, and certainly a private action inextricably intertwined with the actions of the government. It is hard to imagine a situation where a private individual or entity has "carte blanche" to systematically choose to violate one's civil rights on the basis of race or color, but because the police were <u>not</u> notified in advance, it was not in "concert" with police and would not fall within the purview of the very purpose of Section 1983.

Moreover, by correspondence directly from Bank of America dated April 4, 2011, to the Consulate General of Mexico in Sacramento, California, Peter Lendrum, Senior Vice-President and Consumer Market Executive for the Sacramento Metropolitan Market, admitted that "<u>this was an isolated fact-specific incident</u>" ... and that "Bank of America does not implement or condone policies or practices that discriminate or infringe upon the rights of Mexican Nationals in any way." (See declaration of Hank G. Greenblatt) Bank of America cannot have it both ways. They cannot take the position they openly encouraged Mexican nationals to open accounts at Bank of America, and that this incident involving Mr. Aivaliklis was an "isolated fact-specific incident", yet that Mr. Aivaliklis was acting as he was entitled and directed and expected to do by Bank of America, to "demand" to see a Social Security card, which is not even required by Bank of America to open an account. Accordingly, factually this is no different than if Mr. Aivaliklis had demanded to see Mr. Martinez's "green card" or "passport." Perhaps Defendants believe their self-styled authority extends to stopping someone on the street and demanding to see their "papers." It was something he was not legally entitled to

demand, had not been directed by Bank of America to demand it, yet he held himself out as having the authority like a law enforcement official to insist upon seeing Mr. Martinez's card.

In *Lugar v. Edmondson Oil Company Inc.*, 457 U.S. 922, 940 (1982) the Supreme Court significantly lightened the burden on Plaintiffs bringing Section 1983 actions against private party under the "joint participation" rationale of state action. The court held that a private creditor becomes a state actor when it files a petition with the court seeking to attach a debtor's assets pursuant to a state statute that allegedly violates due process. <u>The court concluded that a plaintiff may satisfy Section 1983's state actions requirement merely by showing that the private defendant "acted together with or obtained significant aid from the state officials."</u> In that situation, the private creditor triggered the subsequent attachment of the debtor's property by public officers, and was sufficient to meet this test. Certainly Defendant acted together with the police when he called to report a "suspected crime."

By its terms, Section 1983 can be used to remedy the deprivation of "rights" granted to the plaintiff under the Constitution, federal statutes, and regulations implementing the statute. Constitutional provisions that are enforceable by a private party under Section 1983 consists of those which create personal rights and either explicably apply to the states or have been held to apply to the state by operation of the 14th Amendment.

In determining whether a private party has engaged in "state action" the court must weigh whether the claimed deprivation resulted from the exercise of a right or privilege having its source in state authority, and whether the private party charged with the deprivation could be described in all fairness as a state actor. *Lugar,* id. Under this *Lugar* analysis, a court looks at (1) the extent to which the actor relies on government assistance and benefits, (2) whether the actor is performing a traditional government function, and (3) whether the injury caused was aggravated in a unique way by the incidents of government authority. Because none of these factors is determinative, one can generalize that a deprivation of federal rights by a private party can constitute state action if the government has delegated its authority to the private actor, participated in joint activity to a degree that the actions of one party can be attributed to the other; created the legal framework necessary to carry out the private action;

compel the private party to act in a certain way; knowingly accepted the benefits of an unconstitutional practice, or the private entity is carrying out a traditional state function; or the government has created a special relationship with the plaintiff.

In *Brentwood Academy v. Tennessee Secondary School Athletic Association*, 531 U.S. 288 (2001), a private association which regulated high school sports throughout the state was held to be a state actor, because of the overwhelming majority of its members were public schools. The association received some public funds from dues and games proceeds and its officers were drawn from public schools. The association was seen to regulate sports activity instead of the state board of education. The court concluded that the nominally private character of the association was overborn by the pervasive intertwinement of public institutions and public officials in its composition and workings. It has been stated that a private party may be engaged in "state action" if the act which deprived federal rights would not have occurred but for the existence of a governmental framework requiring government approval or action. In *North Georgia Finishing Inc. v. Di-Chem, Inc.* 419 U.S. 601 (1975) the court found state action in a private parties invocation of a court ordered attachment that failed to afford due process to the debtor. If actions by a private party are carried out with the assistance or accompaniment of state officials, then the state actions requirement can be satisfied, *Dennis v. Sparks* 449 U.S. 24 (1980).

Certainly, bank rules and procedures Defendant created are in strict compliance with statutory regulations for financial institutions, as to verification of the identification of account holders, consistent with the U.S.A. Patriot Act.[12] Certainly, banking institutions are among the most stringently regulated both by federal and state governments. The Patriot Act requires the bank to set forth established procedures to verify the identity of any person seeking to open an account to the extent reasonable and practical; maintaining records of information used to verify a person's identity. . ." (*U.S. Patriot Act* at section 326)

Pursuant to the Patriot Act, the Department of the Treasury requires financial institutions to create customer identification programs, used to verify the identity of customers

---

[12] U.S.A. Patriot Act, Pub. L. No. 107-56, 115 Stat 272 (2001)

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED (FRCP 12(B)(6))

to the extent reasonable and practicable so the bank can form a reasonable belief that it knows the true identity of each customer. (*U.S. Anti-Money Laundering Programs* 31 CFR § 103.121 (2007). It is unclear how Bank of America can state that they were justified in demanding to see Mr. Martinez's Social Security card, yet admitting that customers do not need a Social Security card to identify themselves or to open an account. This is particularly true where Mr. Martinez had previously been issued a photograph identification card by Bank of America, and Defendants could have used such card to establish his identification.

One of the most important Section 1983 issues in such an analysis is the degree to which one can imply "state action" from the fact the Defendant has received government funding or is extensively regulated by the state. Generally, government funding or regulation does not alone make a state actor of the recipient or the regulated party unless one can show such a close connection between the government and the act complained of that the action taken may be fairly treated as that of the state itself. *Jackson v. Metro Edison Co* 419 U.S. 345, 351 (1974) The exact same situation is present. It cannot be disputed that all financial institutions including Defendant are heavily regulated by both the federal and state government. When the bank is performing a function, such as purportedly attempting to verify identification, consistent with Homeland Security Regulations, obviously the act complained of should be fairly treated as that of the state itself.

Under the Symbiotic Relationship Test, even such a standard can be met in this situation, consistent with the courts holding in *Burton v. Wilmington Parking Authority,* 365 U.S. 715 (1961). In *Burton* a city agency leased facilities to a restaurant that engaged in racial discrimination. There, the court found that because the city gained parking revenue from the restaurants operation, that the restaurant acted under color of state law, when it violated the 14th Amendment when it refused to serve black patrons. Here, Defendants were engaged in the very conduct as that of the Defendant in Burton, for the sake of purportedly asserting compliance with government regulations. This is no different than a restaurant refusing to serve black patrons. Mr. Martinez, a longstanding customer of the bank, had extensive identification available to prove his identity; yet Defendants did not ask for that

identification, but rather apparently focused on testing the veracity of a Social Security number for the ostensible purpose of determining if he was an illegal alien. Such conduct cannot and should not be tolerated.

Section 1983 was enacted for the very purpose of protection of individuals from infringement of their constitutional rights by government agents, or those acting privately, under color of authority. Here, what Bank of America did was attempt to utilize their position to demand to see someone's identification to check their immigration status, rather than attempt to verify their identity, <u>proven by the fact that Defendant Aivaliklis did not ask for any other identification which was readily available, to verify the identity</u>. Here, Bank of America and their agent acted under purported color of authority in detaining Plaintiffs, and demanding to see Mr. Martinez's Social Security card, which was not being sought to prove his identity, but rather his immigration status. Defendant's conduct is no different than a thug on a sidewalk demanding to see someone's papers, and threatening to call the police. Such conduct is inappropriate and clearly falls within the intent and purpose of Section 1983.

## IV.
## PLAINTIFF CONTENDS THAT THE MISREPRESENTATION AND FRAUD CLAIMS ASSERTED IN THE COMPLAINT ARE ADEQUATELY PLEAD

It remains unclear if the actions of Mr. Aivaliklis were the official actions sanctioned by Bank of America, or whether they represented an agent acting inconsistent with banking policy, as suggested by the letter from Bank of America's Vice-President to the Mexican Consulate, following this "isolated fact-specific incident."

Here, bank authorities are acting in contradiction of the representations made by Bank of America, that no social security number is needed to open an account. Bank of America spends millions of dollars advertising this fact to the Hispanic community, offering accounts to individuals with nothing more than their Matricula Consular card issued by the Mexican government. Bank of America proudly advertises that no other identification is needed. Yet apparently, further identification is needed at the Marysville branch, when a Social Security number and card was demanded by bank representatives. Interestingly, at no point does Mr. Aivaliklis, in his declaration, suggest that he ask Mr. Martinez for his Matricula Consular card,

his California driver's license, or for that matter, his Bank of America photo identification card. Rather, Mr. Aivaliklis deputized himself to dig deeper into Mr. Martinez's immigration status. Interestingly, at no point did Mr. Aivaliklis state in his declaration that the Fraud Prevention Group instructed him to inspect, touch or copy the Social Security card produced by Mr. Martinez.

If Bank of America is truly advertising the availability of such a product, in order to lure in customers, and then not honoring the very terms of the representation, this certainly would constitute misrepresentation and fraud.

Under California Civil Jury Instructions (CACI) 1900, intentional misrepresentation is demonstrated by proving that:

1. Defendant represented to Plaintiff an important fact was true.
2. Defendants representation was false.
3. Defendant knew the representation was false when it was made, and it was made recklessly and without regard for its truth.
4. That Defendant intended that Plaintiff rely on the representation.
5. That Plaintiff reasonably relied upon Defendant's representation.
6. That Plaintiff was harmed.
7. That Plaintiff's reliance on Defendant's representation was a substantial factor in causing his harm.

At page 34, paragraph 82 of the complaint Plaintiff alleges that he relied upon the representations made by Bank of America, in offering credit and banking services to undocumented Mexican immigrants, eliminating the need for a credit history and/or a Social Security number. At paragraph 84, Plaintiff alleges that Defendant knew the representations regarding credit and banking services to be untruthful when made, and that Plaintiff relied upon these representations to his detriment and damages. Plaintiffs contend that certainly, the elements of fraud and misrepresentation were properly and adequately plead.

### V.
### PLAINTIFF CONTENDS THAT THE CLAIMS FOR CONSPIRACY, CONVERSION OR MISSAPROPRIATION ASSERTED IN THE COMPLAINT ARE ADEQUATELY PLEAD

From the outset, Mr. Aivaliklis had the intention to lure Plaintiff to the branch in order to have him arrested. CACI 3600 provides that a "conspiracy may be inferred from circumstances, including the nature of the acts done, the relationships between the parties, and the interests of

the alleged coconspirators. Plaintiff is not required to prove that the defendant personally committed a wrongful act or that he/she knew all the details of the agreement or the identities of all the other participants."

As the agent of Bank of America, Mr. Aivaliklis used his capacity as branch manager to deprive Plaintiff of his equal protection of the laws and of the equal privileges and immunities under the laws, as stated in Plaintiff's complaint at page 36, paragraph 90. Although Bank of America may or may not have known of Mr. Aivaliklis' intentions and/or plan, the interests and relationship of Mr. Aivaliklis and Bank of America may lead the Plaintiff to infer that a conspiracy existed as set forth in CACI 3600.

With regards to Plaintiff's conversion and/or misappropriation claims, CACI 2100 provides that Plaintiff must prove:

    1.    Plaintiff owned/possessed/had a right to possess personal property
    2.    That defendant intentionally and substantially interfered with plaintiff's property by:
        a.    Taking possession of the property; or
        b.    Preventing plaintiff from having access to the property; or
        c.    Destroying the property; or
        d.    Refusing to return the property after plaintiff demanded its return
    3.    Plaintiff did not consent;
    4.    Plaintiff was harmed; and
    5.    Defendant's conduct was a substantial factor in causing plaintiff's harm.

As stated in Plaintiff's complaint, page 37, paragraph 90, the Defendants further deprived Plaintiff of his rights by closing his account without notice and confiscating his monies. Plaintiff deposited approximately $300.00 in an attempt to open a new checking account. Defendant took possession of this money, and has since prevented Plaintiff from having access to his property without his consent, thus causing Plaintiff harm. Plaintiff contends that such confiscation of his monies amounts to conversion and misappropriation of funds as stated in Plaintiff's complaint.

Plaintiff believes the elements of conspiracy, conversion and misappropriation were adequately plead.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED (FRCP 12(B)(6))

**VI.**
**PLAINTIFF CONTENDS THAT THE HIS CLAIM REGARDING DEFENDANT'S VIOLATION OF THE FAIR HOUSING ACT WAS ADEQUATELY PLEAD SINCE THE TERM "FROZE" IS CLEAR AND NOT VAGUE AS THE DEFENDANT CONTENDS**

Up until the subject incident, Plaintiff's mortgage loan was current. After being detained and unable to work, Plaintiff lost his job and was unable to stay current with his mortgage payments. While attempting to modify his loan, Plaintiff discovered that his mortgage had been "frozen" by the Defendants. In their motion, Defendants contend that the term "frozen" is vague, even though it is the exact term Bank of America representatives used when describing the status of Plaintiff's loan. Plaintiff is merely repeating the terms used by Defendant's representatives. Regardless, Plaintiff interprets Bank of America's use of the term "frozen" as meaning that his account has been put on hold.

Plaintiff was told that he was not eligible for a loan modification due to pending litigation. Plaintiff contends that the defendants unlawfully put a hold on his mortgage as a result of this litigation and because of his race, ethnicity or immigration status. Such retaliatory actions made by the Defendants is in violation of the Fair Housing Act which prohibits "the sale, rental and financing of dwellings based on race, color, religion, sex or national origin," as stated on page 38, paragraph 97 of Plaintiff's complaint.

The action taken against Plaintiff's loan, whether characterized as "freezing, "putting on hold," "suspending," and so forth was done in violation of the Fair Housing Act since the Defendants did so on the basis of Plaintiff's race, ethnicity or immigration status following the subject incident.

**VII.**
**PLAINTIFF CONTENDS THAT HIS CLAIM FOR DECLARATORY RELIEF WAS ADEQUATELY PLEAD**

Again, Defendants contend in their motion that the use of the term "frozen" is vague and therefore Plaintiff's Declaratory Relief cause of action is vague. As discussed supra, Plaintiff is simply repeating and relying on a term used by the Defendant's representatives, which Defendant now contends is "vague."

Nonetheless, on page 39 - 40, paragraph 101 of Plaintiff's complaint, Plaintiff prays for

specific relief against the Defendant, which Plaintiff believes is not in the least bit vague. As such, the Defendant's argument fails.

## VIII.
## PLAINTIFFS ALLEGED SUFFICIENT FACTS REGARDING FALSE IMPRISONMENT CAUSE OF ACTION

CACI 1400 provides the essential elements for proving a false imprisonment cause of action:

> 1. That defendant intentionally deprived plaintiff of his/her freedom of movement by use of physical barriers/force/threats of force/menace/fraud/deceit/unreasonable duress; and
> 2. That the restraint/confinement/detention compelled to stay or go somewhere for some appreciable time, however short;
> 3. That plaintiff did not knowingly or voluntarily consent;
> 4. That plaintiff was actually harmed, and
> 5. That defendant's conduct was a substantial factor in causing plaintiff's harm.

CACI 1400 further states that plaintiff need not have been aware that he/she was being restrained/confined/detained at the time.

As already discussed, Mr. Aivaliklis used unfair and deceptive conduct in order to lure Plaintiff to the branch where he unlawfully detained Plaintiff in his office for approximately ten minutes. When asked by Plaintiff Metzly M. to use the restroom, Plaintiff Martinez was told he would not be allowed to take his six year old daughter nor was he allowed to make a phone call so that Metzly could be picked up (Plaintiff's complaint, page 40, paragraph 105).

With his primary language being Spanish, Plaintiff was unclear as to what was happening, nor did he knowingly or voluntarily consent to such treatment. As stated in his declaration, he (Martinez) felt restrained from leaving the branch, at the hands of the branch manager. Again, Plaintiff was led to the bank under Mr. Aivaliklis' false pretenses. Because of the embarrassment and humiliation, Plaintiff was indeed harmed as a result of Mr. Aivaliklis' conduct.

Plaintiffs contend that sufficient facts were provided regarding the false imprisonment cause of action.

DATED:     **DREYER BABICH BUCCOLA WOOD CAMPORA, LLP**

By: _/s/ Hank G. Greenblatt_
HANK G. GREENBLATT